STATE, Respondent, vs. TIMM, Appellant.*

*December 10, 1943—January 18, 1944.*

---

\* Motion for rehearing denied, without costs, on March 14, 1944.

510

For the appellant there were briefs by *Edward J. Yockey, Sr.,* and *Frank L. Fawcett,* attorneys, and *Gerald L. McDonough* of counsel, and oral argument by *Mr. Yockey* and *Mr. Fawcett.*

For the respondent there were briefs by the *Attorney General, James J. Kerwin,* district attorney of Milwaukee county, *Charles J. Kersten,* deputy district attorney, and *Alfred R. Gandrey,* assistant district attorney, and oral argument by *Mr. Kersten, Mr. Gandrey,* and *Mr. William A. Platz,* assistant attorney general.

· FOWLER, J. The defendant, a licensed physician, was prosecuted upon an information charging manslaughter in the second degree by causing the death of Hazel Williamson, a pregnant woman, by using an instrument with intent to destroy the child, without such operation being necessary or advised by two physicians to be necessary to preserve the life of said Hazel Williamson. The statute on which the action is based is printed in the margin.[1]

Trial was to the court, a jury having been waived. The court found the defendant guilty and sentenced him to im-

---

[1] 340.16 *Manslaughter, second degree.* Any person who shall administer to any woman pregnant with a child any medicine, drug or substance whatever, or shall use or employ any instrument or other means with intent thereby to destroy such child, unless the same shall have been necessary to preserve the life of such mother or shall have been advised by two physicians to be necessary for such purpose, shall, in case the death of such child or of such mother be thereby produced, be deemed guilty of manslaughter in the second degree.

prisonment for an indeterminate term of not less than four years nor more than four and a half years. From that conviction the defendant appealed.

The defendant admits Hazel was pregnant and admits performing two curettements upon her person by use of instruments removing parts of the fetus without advice of two physicians as to its necessity to save the life of the mother. The woman died a few hours after the last curettement, but the defendant claims that the fetus was dead before he performed the first operation as a result of an abortion previously produced by some instrument. He claims that the evidence produced by the state is insufficient to support conviction under the statute because the credible evidence does not warrant a finding that the fetus was alive when his first operation was performed and he then knew the child was then dead and thus could not have had the intent to destroy it.

The state contends, not only that the conviction is supported by credible evidence, but that it does not have to prove that the child was alive when the defendant operated. It cites *State v. Walters,* 199 Wis. 68, 225 N. W. 167, and *Foster v. State,* 182 Wis. 298, 196 N. W. 233, in support of the latter claim. The contention made in these cases, however, turned on the question whether the pregnancy had existed long enough to render the fetus a "quickened child" as the term "quick child" is used in the common law. In the common law a "quick" child is one that has developed so that it moves within the mother's womb. The point of these decisions is that whether a child has become "quickened" or not, if death of the mother results from an abortion the person who performs the abortion violates the statute. This does not meet the contention of the defendant that when a child has already been destroyed and an operation is performed to remove the dead fetus, the one performing such operation cannot have the intent to "destroy the child" which is essential to constitute violation of the statute. In *Foster v. State, supra,*

page 301, it is said: "It is obvious that no death of a child can be produced where there is no living child." There is evidence which, if believed, would warrant a conclusion or at least a reasonable doubt that the child was not alive when the defendant first operated. In this situation the burden was on the state to prove that the child was alive when the defendant operated. The question we have to consider therefore is, Does the credible evidence warrant conclusion beyond reasonable doubt that the child was not already destroyed, in other words was alive when the defendant began operating?

The sole question for determination on the appeal being as above stated, a somewhat detailed statement of the evidence that the judge might properly deem credible tending to support the finding is required. Evidence which he might properly deem incredible need not be stated, as credibility of the witnesses was solely for him to determine. Evidence that he might rightly deem credible may be stated as follows:

On June 10, 1943, Hazel Williamson, a pregnant woman, who will hereinafter be referred to as the "deceased," was driven from her home at Waunakee and left at Madison at 6:45 a. m. She arrived at the office of Dr. Timm, the appellant, who will hereinafter be referred to as "the defendant," at Milwaukee during the afternoon. The defendant examined her condition, and was there paid in cash $200 as stated by the deceased ($100 as claimed by defendant). The doctor at 4 o'clock p. m. arranged with Mrs. Schlabach, who was a practical nurse and conducted a "lying-in home" in Milwaukee, for a room and care for her. The defendant drove her to this home and left her there at 9 o'clock p. m. The deceased was taken to her room. She then appeared healthy and strong and was well-nourished.

On June 11th, the deceased went from the Schlabach "home" to the Western Union Telegraph office in Milwaukee and received $50 in cash which was wired to her from Waunakee. She delivered this to the office clerk in the defendant's

office in the absence of the defendant between 11 and 12 o'clock. The clerk put the money in the defendant's desk but did not tell him. At 2:30 p. m. the defendant asked the clerk if anyone had left anything for him. The deceased arrived back at the "home" during the afternoon.

On Saturday, June 12th, the deceased went to defendant's office for a "treatment;" to get a miscarriage performed; the treatment hurt her; the defendant was like a horse doctor, he treated her so rough. She was terribly sore at 7:30 p. m. Her temperature was 103½ to 103⁸⁄₁₀ degrees. Mrs. Schlabach applied cold compresses and called defendant by telephone but could not reach him.

On Sunday, June 13th, the deceased felt better than on Saturday. Her temperature was 101 degrees.

On Monday, June 14th, defendant curetted the deceased at 10 a. m. The deceased was not well. A part of a leg of the fetus was removed with instruments; it was not black, but dark; was not decomposed. The defendant said the deceased was too weak for a complete curettement; too weak to be removed to a hospital. At 8 p. m. the defendant completed the curettement; removed all of the fetus but the head; removed the placenta. The deceased was then very weak.

On Tuesday, June 15th, at 1 a. m. Mrs. Schlabach gave the deceased a tablet as prescribed by the defendant; went to the kitchen; returned immediately and found the deceased was dead; called the defendant. The defendant came at 1:30 a. m. He worked five minutes to insert a soft catheter in the vaginal canal of the deceased's body; withdrew the catheter and put it back in his surgeon's bag. The defendant also asked for the deceased's purse; took from the purse a paper, tore the top from it, and put the rest of the paper back in the purse. The defendant gave the purse with the remainder of the paper in it to the coroner.

On Tuesday June 15th, at 11:30 a. m. Dr. Tharinger made an autopsy of the body of the deceased. The lining of the

vagina showed four tears or lacerations, the healing process of which had not begun. The opening into the canal of the cervix which opens into the uterus showed a small laceration; the cervix also showed a puncture. The uterus was filled with a frothy bloody fluid and some soft blood clot, and contained the head of a fetus that indicated a pregnancy of from two to five months; the head was in a very early stage of maceration, which is a softening process such as would be produced by soaking in water, but that was not the cause of it; it (the head) was dead from four to five hours or two to three days; if longer dead the change in the head would have been more advanced; it might possibly have been dead four or five days, but that would have been an extreme length of time; there was no stage of decomposition. A coloration of the portion of the leg removed by the defendant in the first curettement above mentioned, would not indicate that the fetus was dead on June 10th. The extremity of a live fetus projecting from a womb can be torn from the body without any great difficulty. The structure of a fetus is not so strong that it cannot be torn. The deceased died of septicemia and a uterine hemorrhage the result of an abortion. The conditions found at the autopsy were consistent with the commencement of an abortion on June 10th. The insertion of a soft catheter in the womb of a pregnant woman may produce an abortion. On the trial the defendant produced a soft catheter that he claimed projected from the deceased's womb that was fastened to a pack in the vaginal canal when he examined the deceased on June 10th.

The paper above referred to as in the deceased's purse was introduced in evidence. Mr. Taylor, who drove the deceased to Madison on June 10th and who had been keeping company with her, wrote on the paper the names and addresses of three physicians and gave the paper to the deceased. The top name and address he wrote thereon was that of the defendant.

Two physicians besides the defendant testified for the defense. All three testified that in their opinion the fetus was dead when the deceased went to defendant's office on June 10th, and as to how long it had then been dead. The opinion of the two other than the defendant was based wholly on hypothetical questions based on the hypothesis that the facts were as the defendant testified them to be. The testimony amounted to no more than saying that if the defendant's testimony as to the conditions existing was true their opinions were as stated. The converse is of course also true,—if the facts were not as stated in the hypothesis, the answers of the witnesses were of no value or effect whatever. The credibility of the defendant was of course for the trial judge to determine. If he believed him he could do no less than find him innocent. He found him guilty. Manifestly he considered the defendant's testimony incredible. He also stated that the defendant's testimony was impeached in so many particulars that he could give it no credence, and that there was no reasonable doubt in his mind of the defendant's guilt. The trial judge made no statement of the evidentiary facts as he found them to be. But as upon the evidence before him, he might properly find them to be as above stated, we must assume in support of his judgment that he so found them. In our opinion the facts being as stated the judge's conclusion of guilt is justified. We see no occasion to specify our reasons for that opinion. We let the facts speak for themselves.

Counsel for the defendant have filed a supplementary brief in which they state two propositions not suggested in their original briefs. These are: (1) The state offered in evidence statements made by the defendant to the district attorney and thereby made the defendant its own witness and cannot impeach him; and as the defendant therein stated that the fetus was dead when he first examined the deceased, the statement cannot be disputed; (2) the conviction of the defendant

rests on statements of the deceased and the evidence of these statements was not receivable because it was "hearsay."

(1) It is elementary that "The rule which forbids one to impeach his own witness must not be understood to imply that the party is bound to accept the testimony of a witness as correct. On the contrary, the one producing a witness may prove the truth of material facts by any other competent evidence even though the effect of the testimony is directly to contradict his own witness." And "a party may rely on part of such testimony, although in other parts the witness denies the facts sought to be proved." 3 Jones, Evidence (4th ed.), pp. 1588, 1590, sec. 857.

(2) The exceptions to the "hearsay" rule are so numerous as to be beyond counting. In 6 Wigmore, Evidence (3d ed.), two hundred eighty pages are devoted to them. It may rightly be said of the rule that "It is more honored in the breach than in the observance." Counsel for the defendant concede that by Wisconsin cases the statements of the deceased made prior to going to the defendant for treatment as to the purpose for which she went were admissible. *State v. Dickinson,* 41 Wis. 299; *Kraut v. State,* 228 Wis. 386, 280 N. W. 327. Nearly all of the statements of the deceased were as to her going to the defendant's office and what she went for, and were made prior to or contemporaneously with her going. The only statement relating to past transactions of any material bearing is a statement made to one witness, Mrs. Streeter, who testified that after returning from a visit to the defendant's office on Saturday, June 12th, the deceased said that the defendant "hurt her—treated her roughly, like a 'horse doctor;' made her so sore she could hardly walk." Mrs. Schlabach, who operated the rooming house where the deceased stayed in Milwaukee, also stated that the deceased told her she had gone down to the Western Union Telegraph office on Friday to get money to give to the doctor, but that fact is definitely proved by other competent evidence.

The statement to Mrs. Streeter, above quoted, however, was admissible on the ground that it was a statement by a coconspirator of the defendant as to a matter relating to the carrying out of a conspiracy made while it was being carried out. From the finding of the trial judge it is manifest that he considered that the deceased and the defendant entered into a conspiracy for the performance of a criminal abortion upon the deceased. Prof. Thayer has said of the rule applicable between coconspirators that statements by one are admissible against another when made while engaged in and regarding the common enterprise. "In such cases, evidently, the declaration may be about a past fact as well as a present one, so long as it comes up to the above-named requirements." See quotation in 6 Wigmore (3d ed.), p. 184, sec. 1769, from article in 15 American Law Review, 80. And Prof. Wigmore says of the rule: The acts and admissions of a conspirator are admissible against a coconspirator when they occurred in the duration of the conspiracy.

The only expression of this court directly to the question whether declarations of a coconspirator relating to a past occurrence are admissible against the defendant in a criminal case is in accord with the above statements of Profs. Thayer and Wigmore so far as the declarations of the instant deceased go to the purpose for which her trips to the defendant's office were made. Whether the court intended to go further is perhaps not clear. *State v. Dickinson, supra.* See page 301 for the nature of the declaration there involved and pages 306 and 307 as to the court's ruling. It is quite apparent that the statement made by the deceased after returning from her trip on Saturday that the defendant treated her roughly is quite as indicative that the deceased was having an abortion performed by the defendant as was any other of her declarations, and no reason is perceived why that declaration was not as properly receivable as showing her intent as was any of her other declarations. We consider the statement of the deceased

as to how the defendant treated her was properly received. We held in *Kraut v. State, supra,* an identical case, that the woman and the defendant were coconspirators and that the deceased woman's declarations were admissible against the defendant. The Wisconsin cases there cited in support do not reach the point of the admissibility of the deceased's declarations, but the three cases from other jurisdictions so cited, *State v. Crawford,* 133 Iowa, 478, 110 N. W. 921; *State v. Gilmore,* 151 Iowa, 618, 132 N. W. 53; and *Johnson v. People,* 33 Colo. 224, 80 Pac. 133, definitely hold that in cases involving criminal abortions the woman and the person performing the abortion are coconspirators, and that in a prosecution of the latter for causing the death of the woman the declarations of the deceased are admissible against him if made during the pendency of the conspiracy and properly related to it. See also *State v. Brown,* 95 Iowa, 381, 64 N. W. 277; *Solander v. People,* 2 Colo. 48; *Regina v. Whitechurch,* L. R. 24 Q. B. Div. 420. Anyhow, as the case was tried to the court, if the declaration immediately under consideration was improperly received, the error is not available on appeal or error, unless it is apparent that the error necessarily affected the court's judgment and it is not here so apparent. See *Wheeler & Wilson Mfg. Co. v. Laus,* 62 Wis. 635, 23 N. W. 17; *Hill v. American Surety Co.* 112 Wis. 627, 88 N. W. 642; and other cases cited in 1 Callaghan's Wis. Dig. p. 352, sec. 679.

It is urged that the declarations of one coconspirator will not be received against another until a *prima facie* case of a conspiracy has been first made, and that in this case no such case was made when deceased's declarations were offered. The premise is correct, but we consider that the conclusion is not. The testimony as to the deceased's declarations was given by three witnesses. All the evidence on which the facts above stated which we held supported the finding of guilt had been received before these witnesses testified, except the de-

ceased's declarations and the statement made by the defendant
to the district attorney.    We consider that this evidence made
a *prima facie* case of a conspiracy between the deceased and the
defendant for the performance of a criminal abortion.

*By the Court.*—The judgment of the municipal court is
affirmed.