STATE, Respondent, v. COHEN, Appellant.*

*April 15—May 10, 1966.*

* Motion for rehearing denied, without costs, on July 1, 1966.

For the appellant there was a brief by *Charles J. Kersten* and *Martin J. Price,* both of Milwaukee, and oral argument by *Mr. Kersten.*

For the respondent the cause was argued by *Robert E. Sutton,* assistant district attorney of Milwaukee county, with whom on the brief were *Bronson C. La Follette,* attorney general, and *Hugh R. O'Connell,* district attorney.

GORDON, J.

### A Review of the Evidence.

Since the appellant has challenged the sufficiency of the evidence, it becomes necessary that we review the evi-

dence. The intrinsic nature of the case forecloses any great delicacy.

On April 12, 1963, Patricia Hanley, an eighteen-year-old, unmarried resident of Minneapolis, was informed by her physician that she was pregnant. Patricia told her friend, Roberta Dahl, of her condition and of her desire to have a miscarriage. Pursuant to Roberta's suggestion, Patricia took some quinine pills and a mustard bath in an attempt to cause a miscarriage.

Patricia testified that on April 16 or 17, 1963, Roberta telephoned the defendant, Dr. Cohen, from the Dahl home and made arrangements for a visit with him in Milwaukee. She said that she and Roberta arrived at Dr. Cohen's office at about 8 a. m. on April 20, 1963, and that she then paid Dr. Cohen $400 upon his request.

Patricia further testified that she went into an examining room, removed her clothing except for a half slip, and positioned herself on her back upon a table. She stated that Dr. Cohen inserted some medical instruments into her body and she experienced internal pain and a pulling sensation in the vagina. Patricia claimed that the doctor told her he was having some trouble "getting parts of it out."

The procedure in the doctor's office lasted about forty-five minutes; Miss Hanley stated that thereafter Dr. Cohen gave her a supply of ergot tablets to stop any bleeding. She said that she thought she put on a pad after the treatment and prior to leaving the doctor's office. The two women then took a bus back to their hotel, rested for about an hour and a half and then returned to Minneapolis by train.

Patricia stated that her supply of ergot pills ran out four or five days after leaving Milwaukee and that she began to bleed in small amounts. She said that on May 5, 1963, she began to hemorrhage and evacuated some blood clots. She explained that when this occurred again on May 15th she was prompted to call Dr. Cohen, who told

her to purchase some ergot pills and also advised her to consult her family physician.

Patricia entered Minneapolis General Hospital on May 15, 1963, and remained there until May 17, 1963, under the care of Dr. Donald Johnson, whom she told about the prior events at the defendant's office. Dr. Johnson testified that he diagnosed her condition as an incomplete abortion; he performed a uterine curettage, removing several fragments of placental tissue.

Miss Hanley testified that on May 17, 1963, she signed a statement at the Minneapolis police department detailing her involvement with Dr. Cohen. Milwaukee authorities were informed of the transaction, and on June 6, 1963, an investigator in the Milwaukee county district attorney's office transmitted the complaint to the appellant.

Miss Hanley said that on the following day, June 7, 1963, she received a telephone call from Attorney Donald Jacobson, representing Dr. Cohen, who asked her to meet him at the Milwaukee Road depot in Minneapolis. Patricia added that she and Roberta went to the depot and met with Mr. Jacobson, who advised her that if she wrote a letter to the Milwaukee authorities exculpating Dr. Cohen, the case would probably be dropped and Patricia could avoid any publicity and thereby protect the boy involved. Patricia testified that she told Mr. Jacobson that her statement to the Minneapolis police was truthful, but she nevertheless consented to write the letter (Exhibit 4), which she said was designed to have the case dropped.

Patricia said that after the letter was written Mr. Jacobson gave her $400, although he had not previously mentioned money as an inducement. She acknowledged that Mr. Jacobson did not threaten her and that he "was a gentleman at all times." Patricia stated that she later received $72 from Mr. Jacobson to cover her hospital bill.

At the trial, Miss Hanley stated that the contents of the letter (Exhibit 4) were not true.

On June 23, 1963, Patricia gave a statement to Mr. Hugh O'Connell, of the Milwaukee county district attorney's office, in which she repeated her inculpation of Dr. Cohen. This statement contained assertions regarding her bleeding before seeing Dr. Cohen and regarding the latter's comments about blood clots. These aspects of the evidence will be considered more closely in a subsequent portion of this opinion.

Dr. Cohen testified that he had known Ann Dahl, Roberta's mother, for about two years prior to April, 1963, having once treated her. He further stated that Mrs. Dahl had sent people with social diseases to him on numerous occasions, and that in March, 1963, she had brought her daughter, Roberta, to Dr. Cohen to determine if Roberta was pregnant.

Dr. Cohen stated that Mrs. Dahl telephoned him on April 18 or 19, 1963, and told him that her daughter's friend, Patricia Hanley, "was pregnant, that she had taken quinine pills, hot mustard baths, and she began to hemorrhage and [was] flowing very heavy." Dr. Cohen testified that he advised Mrs. Dahl to take the girl to a local hospital but that Mrs. Dahl pleaded with him to be merciful and to treat her to prevent her parents from discovering her pregnancy. According to Dr. Cohen, he told Mrs. Dahl that he would take care of her but could not perform any operation if such was necessary.

The appellant testified that Patricia and Roberta arrived at his office on the morning of April 20, 1963, and that Patricia advised him that she had started bleeding about six days before coming to Milwaukee, that Mrs. Dahl had advised her to take quinine pills, that she had had very strong cramps and pain, that she had begun to bleed very heavily after taking the pills, and that she had passed blood clots prior to seeing him.

Dr. Cohen stated that upon examining Patricia, he noticed blood clots in the lower part of her vagina, which

he cleaned out with a forceps. He also claims to have observed a piece of necrotic tissue protruding from the cervical canal and discovered that Patricia had a retroverted uterus which caused pain when pressed forward. He stated that he told Patricia that she had had an incomplete miscarriage and that in order to get relief she would have to go to the hospital and have a curettment. He advised her that it would cost between $600 and $700, whereupon he said Patricia gave him $400 and asked him to make the necessary arrangements and said that she would return with the rest of the money.

Dr. Cohen testified that the next time he heard anything about Miss Hanley was on June 6, 1963, when the district attorney's investigator apprised him of the abortion charge. The appellant stated that upon being informed of Miss Hanley's complaints he retained Mr. Jacobson to safeguard his interests and to return the $400.

### The Hypothetical Questions.

The defendant claims that his conviction was erroneous because the evidence shows that Miss Hanley was already in the process of aborting when she first met with him. In support of his contention, the defendant relies upon his own testimony, upon certain evidence given by Miss Hanley, and upon the opinions of two Milwaukee gynecologists, Dr. Alvin Kurzon and Dr. Richard Mattingly.

The two medical doctors, in response to hypothetical questions, concluded that Miss Hanley was in "some phase of miscarriage" or "in the process of an inevitable or imminent abortion." Such opinions were clearly based upon the hypothesis that she had been bleeding and that there were blood clots in her vagina prior to her visit to the defendant's office.

Dr. Mattingly, upon inquiry by Judge STEFFES, testified that the amount of bleeding and the existence of blood clots would be the significant factor upon which he

would base his opinion regarding the inevitability of the miscarriage. He also testified that the taking of ergot pills would cause the uterus to contract, thereby restricting the amount of bleeding. Dr. Mattingly further stated that the prior taking of quinine pills and a mustard bath would have no significance or relevancy.

The trial court rejected the defendant's testimony as untrue and untrustworthy. Accordingly, it is crucial to the success of the appellant's argument that the opinions of the medical doctors were based on facts which were competently established by testimony other than that of Dr. Cohen.

To prove the truth of his contention that Miss Hanley had in fact been bleeding before she visited the doctor's office, the appellant points to the statement that Miss Hanley had given to Mr. O'Connell on June 23, 1963, which contains the following:

"Well, I was bleeding before I went but I went in for the purpose of an abortion."

At the trial, however, Miss Hanley contradicted the foregoing statement and testified that she had not been bleeding previously.

In the same statement given on June 23, 1963, Miss Hanley was asked what Dr. Cohen had told her would happen at his office, and she replied, "He said that he would remove certain clots that had already formed and would try to remove the rest." This answer, however, was crossed out, and the following words were written in after the answer and initialed by Miss Hanley: "This answer was untrue." At the trial she denied that Dr. Cohen had told her that he was going to remove clots that had already formed.

It is our opinion that conflicting evidence was presented to the trier of fact as to whether Miss Hanley had been bleeding before she went in to see the doctor and also as to whether there were blood clots formed prior to such visit. The version of the facts urged by the appellant was

sufficiently controverted so as to leave it peculiarly within the scope of the trial court whether to believe it or to disbelieve it.

The failure to give credence to the medical opinions would necessarily follow if the lower court did not believe the essential facts assumed in the hypothetical questions. The total dependence of such opinions upon the validity of the facts assumed in the hypothetical questions was clearly stated by this court in *Kreyer v. Farmers' Cooperative Lumber Co.* (1962), 18 Wis. (2d) 67, 77, 117 N. W. (2d) 646:

"The purpose of a hypothetical question is to give the jury the benefit of an expert opinion upon one or another of several situations which may be found to exist in the evidence. The key point in a hypothetical question is the facts that are assumed and form the premises. If these facts fail in any important particular then necessarily the answer or conclusion that assumes the facts must fail."

Additional cases in which this court has pointed out that an infirmity in the hypothesis attaches to the answer founded upon it are *McGaw v. Wassmann* (1953), 263 Wis. 486, 492, 57 N. W. (2d) 920, 58 N. W. (2d) 663; *State v. Timm* (1944), 244 Wis. 508, 515, 12 N. W. (2d) 670; *Will of McGovern* (1942), 241 Wis. 99, 107, 108, 3 N. W. (2d) 717.

*Other Claimed Exculpating Factors.*

The appellant points to a number of other circumstances which, it is urged, demonstrate that there must be a reasonable doubt that Dr. Cohen did in fact perform an abortion. Miss Hanley was not given an anesthetic at the time she was in Dr. Cohen's office, and it is claimed that this is inconsistent with a planned abortion. This fact is pressed particularly in light of the contention that she did not complain of great pain at the time of the events in the doctor's office. However, she testified that she did endure pain, and we do not find impressive the

contention that the absence of either an anesthetic or excruciating pain must necessarily outweigh the other evidence that an abortion was performed.

Reference is also made by the appellant to the fact that a few minutes after she dressed herself and left Dr. Cohen's examining room Miss Hanley walked out of his office, unaided, and took a bus back to her hotel. After resting for only an hour and a half at the hotel, she returned by train to Minneapolis. It is contended that this amount of movement by her within such a short time after the alleged abortion would have been accompanied by great discomfort and profuse bleeding. It is the appellant's claim that her extensive movements and the absence of bleeding demonstrate that an abortion did not actually occur. On the other hand, the record discloses that the doctor gave Miss Hanley ergot pills to check the bleeding, and further it appears that she wore a pad.

When Miss Hanley telephoned Dr. Cohen from Minneapolis a few weeks after visiting his office and advised him that she was hemorrhaging, she was told by Dr. Cohen to consult her family physician. It is the appellant's contention that this advice was inconsistent with a guilty mind and suggests Dr. Cohen's innocence. The trial court was entitled to evaluate the significance of this testimony and may well have concluded that it was either a desperation move on the part of the defendant or it may have reflected his confidence that Miss Hanley would not want to get "involved" with a criminal prosecution. We recognize that we are speculating on the impact of this testimony upon the trial court, but we are persuaded that it is not of such significance as to warrant a reversal.

### Conclusion.

In our opinion, the defendant's guilt or innocence depended on the credibility of the witnesses. If Dr. Cohen's testimony had been believed, a different result would irresistibly have followed. However, the trial court

gauged his credibility "at the very lowest degree" and added, with reference to Dr. Cohen's testimony, that "the air was figuratively pungent with the acrid fumes of perjury."

The appraisal of the relative credibility of the several witnesses was a proper function of the trial court and one which this court finds no basis for upsetting. *Drane v. State* (1965), 29 Wis. (2d) 208, 211, 138 N. W. (2d) 273; *Gauthier v. State* (1965), 28 Wis. (2d) 412, 417, 137 N. W. (2d) 101.

*By the Court.*—Judgment affirmed.