KING, Plaintiff in error, v. STATE, Defendant in error.

*No. 75–574–CR.  Argued November 4, 1976.—*
*Decided January 6, 1977.*
(Also reported in 248 N. W. 2d 458.)

For the plaintiff in error there was a brief and oral argument by *Howard B. Eisenberg,* state public defender.

For the defendant in error the cause was argued by *Michael R. Klos,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

CONNOR T. HANSEN, J.   The single issue in this case relates to whether the trial judge properly admitted certain rebuttal testimony of the state concerning specific prior violent acts of the defendant. Many of the facts incident to the fatal shooting of Linda Swenson by Richard D. King, defendant, are not in serious dispute.

The incident occurred at approximately 12:30 p.m., on November 16, 1974, in an apartment located at 641 Bayview avenue in the village of Twin Lakes, Kenosha county. The apartment was then occupied by the defendant, Linda and two children. The defendant and Linda were not married; the defendant was the father of one of the children, and the autopsy on the body of Linda determined that at the time of her death she was pregnant on a full term male infant. The defendant was the father of the child with which she was then pregnant. Linda was killed by a bullet wound in the head. The fatal bullet was fired from a revolver, held at close range, by the defend-

ant, who claimed he did not believe the weapon was loaded at the time and that he didn't intend to kill Linda. The revolver was found on the floor of the apartment, near the body of Linda, and contained three shells, two full and one empty.

Besides the defendant, Linda, and the two children, the defendant's brother, Alfonso King, and his friend, William Lowery, were present in the apartment. Lowery and Alfonso had driven from Chicago the previous evening, November 15, 1974, for a visit and stayed overnight at the 641 Bayview avenue apartment.

Lowery testified that when he and Alfonso arrived at the apartment at about 9 p.m., the defendant was not there; but they met Linda Swenson, whom they knew as Linda King, wife of the defendant; the two young children of Linda; and a woman who appeared to be the baby sitter (later identified as Ruth Freund). Lowery and Alfonso went to look for the defendant, couldn't find him, and returned to the apartment to visit with Linda and the children.

Lowery testified that the defendant returned home shortly thereafter and sat down to talk. During the ensuing conversation, the defendant showed them his revolver and rifle. Lowery stated that the defendant removed four shells from the revolver during the conversation but that he reloaded the revolver later and hung it back on the living room wall. Lowery testified that everything seemed friendly and normal that evening; that there were no arguments between Linda and the defendant, and that he retired about 12 midnight.

It was Lowery's testimony that at about noon on November 16, 1974, Linda was in the kitchen fixing lunch when one of the children spilled something in the living room and the defendant called Linda in to clean it up. Lowery stated: "Well, I was trying to watch television and I heard—I glanced around and he had taken the pistol from the wall and held it, pointed it towards his

wife and said, I will shoot you, and about that time the gun discharged and she fell to the floor." Lowery testified that the defendant was holding the revolver about five inches from Linda's face when it discharged and that the defendant said "I will shoot you," or "I will kill you," just prior to the discharge.

Lowery testified that the mood between the defendant and Linda on that morning had been playful and that he thought that the defendant and Linda had been "pranking" immediately prior to the shooting. He specifically observed the defendant grab Linda's stomach prior to the shooting and tell her he wanted a boy. Lowery testified further that the defendant and Linda did not appear to be angry with one another, and that it did not appear to him that the defendant intended to kill Linda. Lowery stated that the defendant looked both surprised and frightened when the revolver went off.

Lowery had previously testified in a written statement and in the preliminary hearing that the defendant and Linda had had a few cross words immediately before the shooting and that they had argued that morning. Upon questioning by the district attorney, Lowery admitted that since he had just met the defendant, it was difficult for him to tell if the defendant was really angry or just playing.

The state called a number of police officers as witnesses. These included Twin Lake police officers Frank Zembal, Russell Say and Wayne Trongeau. Zembal and Say responded to a rescue call at the apartment. Upon receiving the call, Zembal requested the assistance of Trongeau because he knew that Trongeau had previously responded to family calls at the residence of the defendant. Trongeau testified that at the scene the defendant stated that Linda had caught him cheating; that she had caught him with Ruth (Ruth Freund), and that they had argued and he had shot her. Officer Say testified that he heard the foregoing statement made by the defendant.

Roger Zeihen, a detective with the Kenosha county sheriff's office, testified that he had assisted in the interrogation of the defendant on November 16, 1974. Zeihen stated that while in the booking area of the sheriff's department and after having been advised of his constitutional rights, the defendant stated: "I deserve to spend my life in prison . . . I did it." Zeihen again advised defendant of his constitutional rights and proceeded to elicit a taped statement from the defendant. The substance to the taped statement was that the defendant stated: That he had not shot Linda; that Linda had shot herself; that Linda knew that he had spent the night with another woman; and that he had reloaded the revolver that morning and hung it back on the wall after showing it to his brother. The taped statement was introduced into evidence and heard by the jury.

Officer Zembal testified that he had obtained a second taped statement from the defendant and that the substance of it was that on November 16, 1974, Linda discovered that the defendant had been with another woman. Zembal further testified that when he was at the apartment, in response to the rescue call, he had removed a loaded 30/30 lever action Marlin rifle from the living room wall. The second taped statement was also introduced into evidence and heard by the jury.

The district attorney then made an offer of proof in chambers and indicated that he wished to introduce evidence of two prior acts of the defendant through the testimony of Mary Kominiak Bailey and Ruth Freund.

The court heard the summarized testimony and determined that the evidence of the two prior acts would be relevant on the issues of intent and *modus operandi* or method of threatening, and that such evidence would not be unduly prejudicial. The court did, however, warn the district attorney that if he wished to introduce any further evidence of prior acts, the court would balance its

probative weight against any possible prejudicial effects prior to ruling on its admissibility.

Mary Kominiak Bailey testified that she lived with Linda and the defendant off and on from April, 1973, to January, 1974. She testified that sometime during the summer of 1973, the defendant had become upset when the downstairs neighbors accused him and/or Linda of stealing a vacuum cleaner. The defendant questioned Linda about its location and when she refused to tell him, the defendant shot at her twice with his pistol, missing her by six inches and four inches, respectively. Bailey testified that the defendant then also hit and kicked Linda, who was pregnant at the time. Bailey stated that the defendant then aimed the gun at her forehead and threatened to shoot her if she didn't tell him the truth about the vacuum cleaner. She convinced him that she knew nothing, and he put the gun down. Bailey testified that both she and Linda remained living with the defendant after the occurrence.

Following Bailey's testimony, the court instructed the jury that prior conduct was not to be considered as proof that the defendant committed the crime charged.

Ruth Freund testified that she had been having an affair with the defendant since October, 1974, and specifically that she had slept with the defendant in the bedroom, having sexual intercourse with him on the night of November 15, 1974, while Linda and the children slept in the living room.

Freund testified that Linda knew about the affair, and although Linda never said anything about it, she knew that Linda was not happy about the arrangement. Freund characterized the relationship between the three of them as one in which she and Linda "shared" the defendant. Freund stated that she believed that Linda and the defendant had been quarreling on the morning of November 16, 1974, because Linda was upset that the

defendant's brother was present and that he might discover the relationship between the three of them.

Freund also testified to an incident which occurred on the morning of November 16, 1974. She stated that the defendant, who had gotten up earlier, returned to the bedroom and ordered her to get up. When she refused he aimed the revolver at her and pulled the trigger. The revolver clicked and the defendant showed Freund that it was empty and the bullets were in his hand. The defendant laughed, threw the gun on the bed and the bullets on the dresser. Freund testified that she was not frightened because she trusted the defendant. Freund got up, assisted with breakfast, helped Linda dress the children, took Linda grocery shopping, and then left prior to the shooting.

The defense called Alfonso King, the defendant's brother, as a witness. As we view his testimony, it has no material significance to the issue presented for review.

The defendant testified in his own behalf. He testified that he was not legally married to Linda Swenson. He gave his account of the incident involving the vacuum cleaner, admitting specifically that he then did shoot at Linda and slapped her and hit her. The defendant stated that on the night of November 15, 1974, he and Linda and Ruth Freund stayed up until everyone else was asleep because Linda did not want Alfonso to know that the defendant slept with Ruth. He then slept with Ruth in the bedroom while Linda slept on the couch with the children.

The defendant testified that he awoke the next morning at 6 a.m., woke up Linda and then went into the kitchen to "pester" her and play with his unloaded revolver. He went to get Ruth up and when she refused, he pointed the empty revolver at her and pulled the trigger. He stated that he then threw the gun on the bed and left the shells on the dresser.

The defendant testified that later in the morning one of the children spilled something on the living room floor and he called Linda from the kitchen to come in and clean it up. He stated that Linda came in and told him that he loved Ruth more than he loved her; that he hugged and kissed Linda and grabbed her stomach and stated that she would have a boy; and that Linda kissed him back and went to put one of the children on a hobby horse.

The defendant stated that he then grabbed the revolver from the wall, thinking that it was not loaded because he had previously taken the shells out and placed them on the dresser. He stated that he pointed the revolver at Linda, and told her: "[T]ell me you love me like I love you." The defendant then pulled the trigger shooting Linda in the head. The defendant denied ever saying to Linda, "I will shoot you," or "I will kill you." He further stated that he had trouble remembering the time sequences of the events of November 16, 1974.

On cross-examination, the defendant stated that he would slap Linda around whenever she got him aggravated and that he only shot at her over the vacuum cleaner incident to frighten her. He reiterated that he had not reloaded the revolver on the morning of November 16, 1974, and that his relationship with Linda was completely harmonious prior to the shooting.

The district attorney brought forth prior inconsistent statements made by the defendant during the November 16th and 17th taped statements: Specifically, his previous statements that he had been arguing with Linda that morning because she had accused him of having an affair with another woman and his statement that he had reloaded the revolver and hung it back on the wall on that morning. The defendant stated that he had either lied in his previous statements or had been mis-

taken in his recollection of the facts when he gave those statements.

The foregoing facts set forth the background of the relationship between the defendant and the deceased and what we perceive as the facts which relate to the issue presented for review.

The issue is:

Did the trial court properly admit the rebuttal testimony of state's witnesses-Langley and Trongeau who testified to further specific prior violent acts of the defendant?

It arises out of the following evidence presented at trial:

The defense called psychologist John V. Liccione. Liccione testified that he had been furnished with "excessive pounds" of factual material concerning the defendant, including among other things the transcript of the preliminary hearing, a series of police reports, the statements of Bailey and Freund, the statements given by the defendant to the police, and other witnesses' statements. In addition he performed a series of extensive psychological tests and conducted interviews with the defendant over several hours.

Based upon the background information provided to him and upon his own testing and interviews, Liccione concluded that the defendant was not mentally ill nor suffering from any serious emotional disorder, but that the defendant possessed a passive-aggressive personality. He characterized the defendant as not dangerous and as "not overly hostile or aggressive," but as a person who operated by the law of least effort. Liccione explained that the passive-aggressive personality typically responded to stress by avoidance or nonresponse rather than by overt hostile acts. He classified the defendant's relationship with Linda as a "sublimated masochistic" one in which the defendant insisted that Linda defer to

him, and the defendant's play with guns as a means of expressing his "machismo."

Based upon all of the information which he had available and had considered, Liccione concluded that the circumstances which existed prior to the shooting did not offer sufficient provocation for the defendant to intend to kill Linda.

On cross-examination, the district attorney inquired into the factual basis for Liccione's opinion. Liccione acknowledged that the defendant had related to him the vacuum cleaner incident, but Liccione did not recall that the defendant told him specifically about any other incidents involving guns or threats to Linda.

The district attorney asked if Liccione's opinion of the defendant's condition would be altered if other incidents were disclosed where the defendant threatened or injured Linda. Specifically, the district attorney asked Liccione, in the form of hypothetical questions, if his opinion would change if the man under consideration had brandished weapons, made threats and had beaten his wife twice, once in November, 1971, and once in December, 1973. Liccione testified that his opinion would depend on a full understanding of the facts and circumstances related by the district attorney in the hypothetical questions.

William Crowley, psychiatrist, testified that he agreed with Liccione's diagnosis that the defendant possessed a passive-aggressive personality. Crowley additionally testified that the fact that the defendant gave conflicting accounts of the shooting after it occurred indicated that Linda's death was an "unexpected consequence" and that the defendant was having trouble handling his responsibility for it.

The state proceeded with its rebuttal case, calling four witnesses. Martin Paul Kelley, a patrolman for the Kenosha sheriff's department, testified that he initially

booked the defendant on November 16, 1974. Kelley stated that during booking the defendant said to him, "[D]on't ever kill your wife," and that the defendant later said "[I]f she hadn't caught me cheating, none of this ever would have happened."

Evangeline Langley was called to testify as to a prior incident in which the defendant had acted in a violent manner toward Linda. Defense counsel objected on the grounds that the testimony was not relevant nor pertinent rebuttal. The trial court overruled the objection, holding that the psychologist's testimony had opened the door to such rebuttal.

Langley testified that in 1971 she lived in one of the apartments at 641 Bayview avenue and that she knew Linda and the defendant. One night in November, 1971, she heard two shots and heard Linda scream. Langley looked out of her window and saw the defendant with a rifle in his hands and heard him say to Linda, "I am going to shoot you." Linda was let into the apartment across the hall from Langley's and the defendant went back upstairs. Langley and her children, the occupants of the apartment across the hall, and Linda, were all so frightened by the defendant that they got in a car and left. The defendant followed them in his car and tried to force them off of the road. Langley further testified that the defendant appeared to be drunk that evening; that she never actually saw the defendant hit Linda during the incident; that whenever she heard the Kings fighting, the defendant would threaten to kill Linda; and that she finally left the 641 Bayview avenue apartment because of her fear of the defendant.

Officer Wayne Trongeau was recalled to the stand to testify to a similar incident which occurred in December, 1973. Trongeau testified that on December 16, 1973, the defendant came to the police station to pick up a pistol which Linda had turned over to the police because the

defendant had shot at her. About fifteen minutes later Trongeau responded to a neighbor's call and went to the defendant's apartment. He found the apartment in a shambles and Linda badly beaten and bleeding. Linda stated that the defendant had beaten her with the pistol. The defendant was placed under arrest and transported to the police station. On the way to the station, the defendant swore at the officers and threatened their lives. At the jail he attempted to kick Trongeau in the head when Trongeau bent down to pick up a dropped pair of handcuffs. A defense motion to strike Trongeau's testimony as not relevant was overruled by the trial court.

Ruth Freund was recalled as a witness after she explained to the court in chambers that her memory had been faulty and that she had not accurately detailed the events prior to the shooting in her original testimony. Freund now testified that on the evening of November 15, 1974, she heard Alfonso King tell the defendant that he should be sleeping with his wife, and after that statement, a heated argument ensued between the defendant and Alfonso. Freund further testified that on the morning of November 16, 1974, she heard the defendant, Linda, and Alfonso arguing about her presence in the house and that later in the morning the defendant and Alfonso resumed the argument while Linda was crying in the bathroom.

The instructions to the jury included an appropriate instruction on the evidence of the prior conduct of the defendant, the weight to be given the evidence, and the purpose of its admission.

As we view the record, the state attempted to prove in its case in chief that the shooting was deliberate and that the defendant intended to kill Linda Swenson. The prosecution was constructed on the legal presumption that a person intends the natural and probable consequences of deliberate acts. *Fells v. State,* 65 Wis.2d 525, 223 N.W.2d

507 (1974) ; *Holmes v. State,* 63 Wis.2d 389, 217 N.W.2d 657 (1974) ; and *Gelhaar v. State,* 41 Wis.2d 230, 163 N.W.2d 609 (1969).

The state offered evidence to support the presumption by showing both motive and intent in the statements and admissions made by defendant to the police; in the testimony of eyewitness William Lowery; and in the testimony of Mary Bailey and Ruth Freund, who related prior incidents when the defendant brandished weapons and threatened both Linda and the lives of other persons who aroused his anger. As to the latter testimony, the trial court properly balanced the probative value of the testimony against any possible prejudice to defendant as is required by this court's decision in *Whitty v. State,* 34 Wis.2d 278, 149 N.W.2d 557 (1967). The trial court determined that any prejudice to the defendant was outweighed by the probative value of the testimony as it related to the defendant's intent, and allowed the introduction of the testimony into evidence.

The defendant raised the defense of accident, both through his own testimony and through the testimony of a psychologist and a psychiatrist. The defendant testified that he did not intend to shoot Linda; that he did not realize that the revolver was loaded; and that the shooting was an accident. The psychologist testified that in his expert opinion the defendant possessed a passive-aggressive personality; that the defendant was not unduly hostile or aggressive; and that the defendant's typical response to stress would be withdrawal or nonresponse rather than overt hostile act. In addition, the psychologist, based upon his tests and the information made available to him, concluded that the events leading up to the shooting did not offer sufficient provocation for the defendant to intend to kill Linda.

In offering the expert testimony of the psychologist, as it related to the defendant's character, the defendant was

properly relying upon the provisions of sec. 904.04(1)
(a), Stats., and sec. 904.05(1), which state:

*"904.04 Character evidence not admissible to prove
conduct; exceptions; other crimes.* (1) CHARACTER
EVIDENCE GENERALLY. Evidence of a person's
character or a trait of his character is not admissible for
the purpose of proving that he acted in conformity there-
with on a particular occasion, except:
"(a) *Character of accused.* Evidence of a pertinent
trait of his character offered by an accused, or by the
prosecution to rebut the same;
"*. . .*"

*"904.05 Methods of proving character.* (1) REPUTA-
TION OR OPINION. In all cases in which evidence of
character or a trait of character of a person is admis-
sible, proof may be made by testimony as to reputation
or by testimony in the form of an opinion. On cross-
examination, inquiry is allowable into relevant specific
instances of conduct."

Thus in this first-degree murder case, the defendant was
entitled to place into evidence not only opinion testimony
but expert opinion testimony concerning his general
character trait of nonhostility and nonaggressiveness.
*Schultz v. State,* 133 Wis. 215, 113 N.W. 428 (1907);
*State v. Brozyna,* 232 Wis. 163, 286 N.W. 541 (1939);
McCormick, *Evidence* (2d ed.), pp. 454, 455, sec. 191.
The admission of such testimony rested within the sound
discretion of the trial court. *Simpson v. State,* 62 Wis.2d
605, 215 N.W.2d 435 (1974); *York v. State,* 45 Wis.2d
550, 173 N.W.2d 693 (1970).

On cross-examination, the prosecution inquired into
the factual basis for the psychologist's expert opinion
through a series of hypothetical questions. The psycholo-
gist acknowledged that the defendant had related to him
the facts surrounding the vacuum cleaner incident de-
scribed by witness Mary Bailey. The psychologist did
not, however, specifically recall the defendant relating to
him any other incidents in which the defendant threat-

ened Linda or other persons, nor did the psychologist consider any such incidents in formulating his opinion that the defendant was nonhostile and nonaggressive.

The prosecution inquired whether the psychologist's expert opinion would be altered if the man under consideration had brandished weapons, made threats and beaten Linda twice before, once in November, 1971, and again in December, 1973. Such inquiries into specific instances of conduct of the defendant on cross-examination of the expert witness were proper under the provisions of sec. 904.05(1), Stats. *See also: Zebrowski v. State,* 50 Wis.2d 715, 185 N.W.2d 545 (1971); *Simpson v. State,* 32 Wis.2d 195, 145 N.W.2d 206 (1966); *State v. Cohen,* 31 Wis.2d 97, 142 N.W.2d 161 (1966); McCormick, *supra,* p. 456, sec. 191. The psychologist testified that his opinion would depend on a full understanding of the facts and circumstances related by the prosecution in its hypothetical questions.

In its rebuttal case the prosecution introduced the testimony of Evangeline Langley who related the facts surrounding the November, 1971, incident and Officer Wayne Trongeau who related the facts surrounding the December, 1973, incident. Both involved prior specific incidents where the defendant brandished weapons and threatened to or beat Linda.

The defendant contends that the rebuttal testimony of witnesses, Langley and Trongeau, was improperly admitted into evidence. The basic thrust of the defendant's argument is that the testimony was offered to rebut the psychologist's opinion as to specific character traits of the defendant and that the prosecution in such rebuttal was limited to presenting evidence of the defendant's character through the methods of opinion and reputation and not through evidence of specific acts. The defendant's entire argument rests on the premises that the rebuttal testimony of witnesses Langley and Trongeau constituted evidence of character or of a specific trait of

character and thus was impermissible under the provisions of sec. 904.05(1), Stats., which requires such rebuttal to be in the form of opinion or reputation testimony and not evidence of specific instances of conduct.

The trial court did not view, and we think properly so, either the testimony of the psychologist or the rebuttal testimony of witnesses Langley and Trongeau strictly as general character or reputation testimony governed by the provisions of sec. 904.05, Stats. In fact, the defendant advances that analysis for the first time on this review. A review of the record reveals the purposes for which, and the theory under which, the trial court admitted the rebuttal testimony. That testimony was not admitted as general rebuttal opinion or reputation character testimony. The defendant's characterization of the testimony as such is in error.

The trial court viewed the testimony of the rebuttal witnesses as addressed to the opinion of the psychologist that the defendant was not hostile or aggressive. The prosecution, on cross-examination was properly allowed to test the basis of the psychologist's opinion by inquiring whether he was aware of specific instances of conduct which the defendant had previously exhibited. The prosecution did so via hypothetical questions. This court in *State v. Cohen, supra,* citing *Kreyer v. Farmer's Co-operative Lumber Co.,* 18 Wis.2d 67, 77, 117 N.W.2d 646 (1962), stated at page 104:

" 'The purpose of a hypothetical question is to give the jury the benefit of an expert opinion upon one or another of several situations which may be found to exist in the evidence. The key point in a hypothetical question is the facts that are assumed and form the premises. If these facts fail in any important particular then necessarily the answer or conclusion that assumes the facts must fail.' "

Were the prosecution not able to establish as fact the very incidents of prior conduct averred to in the hypo-

thetical questions, the prosecution's case would be subject to attack on the basis that although it averred to the facts, they were never proved, were not in evidence, and the jury should not and could not consider them. *See: Piorkowski v. Liberty Mut. Ins. Co.,* 68 Wis.2d 455, 461, 462, 228 N.W.2d 695 (1975).

■ The trial court has considerable discretion in controlling evidence to be admitted in rebuttal. *Ameen v. State,* 51 Wis.2d 175, 179, 186 N.W.2d 206 (1971); *State v. Watson,* 46 Wis.2d 492, 499, 175 N.W.2d 244 (1970); *Rausch v. Buisse,* 33 Wis.2d 154, 167, 146 N.W.2d 801 (1966). In *Rausch, supra,* this court stated at p. 167:

"The general rule is that the plaintiff, in his rebuttal, may only meet the new facts put in by the defendant in his case in reply. This rule is not inflexible and the court may in its discretion allow or refuse to receive such evidence. An exception is generally made when the evidence is necessary to achieve justice. . . ."

■ The trial court properly exercised its discretion in admitting the rebuttal testimony, not as direct evidence of the general bad character of the defendant, but as evidence which would serve to rebut the basis of the expert testimony of the psychologist. After hearing a defense objection to the testimony of witness-Langley, the trial court stated:

"THE COURT: The point I am trying to raise here, Tom [defense counsel], is the fact that Bruce's [district attorney] questions to the Doctor were based on hypothesis. They were not by any means and could be unless the record shows it objected to at the time of summation as not being facts in the case; and, therefore, his summation could be challenged unless he puts it in. Now, he did not put it in before because it was agreed as to what could go in and what couldn't or what the Court would allow and what it wouldn't. But once the Doctor got on the stand and started to make statements that he had based his opinion upon certain things, then, of course, the door became open and Bruce had a right

to ask him those questions. But those questions are not on the record as fact. . . ."

The prosecution laid the foundation for the rebuttal testimony of Langley and Trongeau when it posed the hypothetical questions to the psychologist on cross-examination. Care should be taken not to allow collateral facts to be proved in rebuttal testimony. However, it was within the trial court's discretion under the circumstances of this case to allow the prosecution to attack the competency of the expert witness by establishing those specific incidents upon which its hypothetical questions were based.

This is not to say that any time a defendant offers evidence of good character or a specific character trait by opinion or reputation testimony, the prosecution can rebut with evidence of specific incidents of conduct. However, when the defendant's character evidence has been submitted in the form of expert opinion, and when the prosecution has attacked the basis of that opinion on cross-examination by hypothetical questions, and the expert has responded to such questions in an evasive and equivocal manner (or indicates that these facts would change his opinion), then it is within the trial court's discretion to give the prosecution opportunity to establish those specific incidents averred to in the hypothetical questions.

An additional basis for the admissibility of this rebuttal testimony exists in that the testimony related to intent and absence of mistake or accident.

Sec. 904.04(2), Stats., provides:

"OTHER CRIMES, WRONGS, OR ACTS. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation,

plan, knowledge, identity, or absence of mistake or accident."

In its case in chief, the prosecution offered evidence of prior violent acts of the defendant through the testimony of Mary Bailey and Ruth Freund. The trial court found those prior incidents of conduct relevant to the issue of intent, probative and not unduly prejudicial to the defendant. The prosecution, in chambers, indicated that it had evidence of other violent acts of the defendant, but because of possible prejudicial effect, it wished to limit evidence to only two instances. The trial court agreed, stating that if the prosecution was going to offer any further evidence of prior conduct, a determination balancing probative value and prejudice would have to be made.

The defendant took the stand and testified that he did not intend to kill Linda; that the shooting was an accident because he did not believe that the revolver was loaded. In addition, the psychologist testified that in light of the defendant's passive-aggressive personality, the events leading up to the shooting could not have offered sufficient provocation for the defendant to have intended to kill Linda.

Intent was an issue before the defense presented its case and the prosecution had an opportunity to offer evidence of prior acts relevant to the issue of intent in its case in chief. Such evidence would have been admissible under the provisions of sec. 904.04(2), Stats., had the trial court determined that its probative value outweighed the prejudicial effect it would have on the defendant. *Whitty, supra; State v. Midell,* 39 Wis.2d 733, 159 N.W.2d 614 (1968) ; *Cheney v. State,* 44 Wis.2d 454, 171 N.W.2d 329, 174 N.W.2d 1 (1969) ; *Hendrickson v. State,* 61 Wis.2d 275, 212 N.W.2d 481 (1973).

The same considerations are applicable to evidence of prior acts introduced on rebuttal. *Hough v. State,* 70

Wis.2d 807, 235 N.W.2d 534 (1975); *Whitty, supra.* The defendant here does not contend that the incidents related by witnesses Langley and Trongeau were not relevant to the issue of intent or to the issues of absence of mistake or accident. Both incidents involved specific instances where the defendant threatened or beat Linda while brandishing weapons. In any event, the trial court specifically found both instances relevant on the issue of challenging the basis for the psychologist's opinion. It cannot be argued that those incidents, so similar in nature to the facts surrounding the instant case, would not also be relevant to the issues of intent and absence of mistake or accident.

The defendant does contend, however, that the evidence was prejudicial to him and that prosecution should have introduced it, if at all, in its case in chief and not in rebuttal.

As to the contention that the evidence should have been introduced in the prosecution case in chief, this court's decisions in *Ameen v. State, supra; Parham v. State,* 53 Wis.2d 458, 192 N.W.2d 838 (1972); and *Hough v. State, supra,* make it evident that the state is not limited to producing evidence of prior conduct relevant to intent in its case in chief. Addressing a similar challenge in *Hough v. State, supra,* this court stated at p. 816:

"The defense challenges the right of the state to have introduced the evidence of prior statements through cross-examination of the defendant, and later in rebuttal by putting into evidence the testimony of the fifteen-year old girl. In a case presenting similar facts, this court has held that such a sequence of cross-examination and rebuttal testimony is a proper order of proof. *Parham v. State* (1972), 53 Wis.2d 458, 192 N.W.2d 838."

As to the contention of prejudice, the record reflects that the trial court engaged in and carefully considered the balancing test required by *Whitty, supra.* The trial

court considered possible prejudice in light of the fact the defendant had produced the testimony of the psychologist and thus had opened the door to relevant evidence of prior acts.

■ The trial court held that the probative value of the evidence of the prior acts introduced on rebuttal outweighed possible prejudice to the defendant. The record demonstrates that the rebuttal testimony was thus admitted only after the trial court was fully apprised of the relevant arguments. The trial court exercised proper judicial discretion in respect to the ruling admitting such testimony.

The defendant asserts that he was prejudiced because the testimony of witnesses-Langley and Trongeau supplied the evidence of "conduct imminently dangerous to another" which served as the basis for the finding of guilty of second-degree murder. The evidence of prior acts was relevant on the issues of intent and absence of mistake or accident. The jury obviously, in its verdict of guilty of second-degree murder, found that the defendant did not intend to kill Linda. The evidence of prior acts could have no bearing on the jury finding that on that specific time and date, the defendant exhibited conduct imminently dangerous to another.

The judgment of conviction is affirmed.

*By the Court.*—Judgment affirmed.